## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

W.D., a minor child, by and through
his Parents and Natural Guardians,
M.J.D. and M.C.D.,

                        Plaintiffs,

v.

Minnesota State High School League
and Craig Perry individually and in
his official capacity.

                        Defendants.

Civil File No: _____

**MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING
ORDER, PRELIMINARY
INJUNCTION, and
WAIVER OF SECURITY**

---

## INTRODUCTION

Plaintiffs submit this Memorandum of Law in support of their request for a temporary restraining order and preliminary injunction, as well as a waiver of security, to restrain and enjoin Defendants from determining that W.D. ("WD") is ineligible for varsity athletics and to allow WD to be eligible for varsity athletics at Lakeville North High School ("LNHS").

## FACTS

The facts are as stated in the Complaint filed on November 13, 2012, and as supplemented by Exhibits, Affidavits, and the file as a whole, are incorporated herein by reference.

## ARGUMENT

In determining whether a temporary restraining order is warranted, the court considers five factors:

1. The likelihood that one party or the other will prevail on the merits when the fact situation is viewed in light of established precedents fixing the limits of equitable relief;

2. Whether or not the harm to be suffered by Plaintiffs if the restraint is denied outweighs that inflicted on the Defendants if the injunction is issued;

3. The aspects of the fact situation, if any, that permit or require consideration of public policy expressed in the statutes, state and federal;

4. The administrative burdens involved in judicial supervision and enforcement of the temporary decree; and

5. The nature of the relationship between the parties pre-existing the dispute giving rise to the request for relief.

*Dahlberg Bros., Inc. v. Ford Motor Co., 137 N.W.2d 314, 321-22 (Minn.1965) (temporary injunction standards); see also M.G.M. Liquor Warehouse Intern, Inc. v. Farsland, 371 N.W.2d 75, 77 (Minn.Ct.App.1985).*

This analysis is similar to the federal standard on whether to grant a preliminary injunction which evaluates:

1. The movant's likelihood of success on the merits;

2. The balance between this harm and the injury that granting the injunction will inflict on the other litigants;

3. The threat of irreparable harm to the movant; and

4. The public interest.

*Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981)*.  The four *Dataphase* factors must be established by Plaintiffs as the moving party, and Plaintiffs must show first that the likelihood of succeeding on the merits is sufficiently high so as to warrant examination of the other three factors.  *See CDI Energy Servs., Inc. v. W. River Pumps, Inc., 567 F.3d 398, 402 (8th Cir. (2009)*.  In the instant case, Plaintiffs likelihood of succeeding on the merits is great, the harm suffered by Defendants is non-existent, the threat of irreparable harm to the movant is certain, and the public interest weighs in favor of granting the instant motion.

## A.   PLAINTIFFS' LIKELIHOOD OF SUCCESS IS GREAT

Plaintiffs are likely to prevail in showing that the League's Bylaws and its actions violated WD's constitutionally protected rights and are additionally in violation of several MN statutes. Plaintiff alleges that the League has violated his right to due process under the *Fourteenth Amendment of the United States Constitution*, that the League has violated the terms of its contract, that the League has breached its fiduciary duty, that the League has violated Minnesota Open Meeting Laws and Minnesota Laws requiring public notice of eligibility rules. A permanent injunction is appropriate to prevent the harm that most certainly will negatively impact Plaintiffs because of the League's eligibility determination.

Plaintiffs' Complaint alleges five counts: Count One alleges due process violations of the *Fourteenth Amendment*, Count Two alleges a breach of contract, Count Three

alleges a breach of fiduciary duty, Count Four alleges a breach of Minnesota open meeting laws, and Count Five alleges a violation of Minnesota Statute requiring that notice be given to the public regarding eligibility rules.  Prevailing on Counts One, Two, Three, or Five would result in a permanent injunction being appropriate.

> **1.    Plaintiffs are Likely to Prevail on Count One Alleging Due Process Violations of the 14th Amendment and Count Five Alleging a Violation of Minn. Stat. § 128C.03.**

The *Due Process Clause of the Fourteenth Amendment* forbids states to "deprive any person of life, liberty, or property without due process of law …."  *U.S. Const. amend. XIV, § 1.*

In addition, Minnesota Statute § 128C.03 provides that the League "shall adopt procedures to ensure public notice of all eligibility rules …."  Thus, the analysis under both counts is similar in that to the extent WD was deprived due process by way of lack of notice, the public was similarly denied notice in violation of Minn. Stat. § 128C.03.

At the outset, it is important to note that "[i]t is well established in Minnesota that the Minnesota State High School League ["the League"] acts under the color of state law in its decision-making capacity.  *G.H. v. Minn. State High Sch. League,* 2002 Minn. App. LEXIS 1141.  The league's regulatory activity likewise involves state action because of the involvement of state school officials in the structure of the association.  The rules governing league members are promulgated pursuant to a procedure that involves member school districts.  *Id.*  League rules and regulations govern eligibility of students to participate in league-sponsored activities; therefore, the league's determination of a

person's eligibility involves state action for the purposes of analysis of a due-process claim. *Id.* That said, the League itself is not a state agency, is not governed by the Administrative Procedure Act ("APA"), and is instead a non-profit promulgated under Minn. Stat. § 317A. *Minn. Stat. § 128C.02 subd. 4; Minn. Stat. § 317A; See Minn. Op. Att'y Gen. 1035, 1999 Minn. AG LEXIS 5 (Aug. 23, 1999)* (stating that the "exact nature of the League as it has evolved is … quite ambiguous. It is generally identified as: A non-profit corporation that is a voluntary association of high schools." (*citations omitted*)). In this case, WD has been deprived of a property interest protected by the *Fourteenth Amendment*, specifically eligibility to participate in varsity athletics, without adequate process of law by private parties acting while clothed in certain delegated powers of the state and Plaintiffs are therefore likely to prevail under Count I. *See Generally Krentz v. Robertson Fire Prot. Dist., 228 F.3d 897, 902 (8th Cir. 2000).*

> a.   *Minnesota Recognizes a Property Right to Participate in Varsity Athletics Which is Protected by the Due Process Clause of the Fourteenth Amendment*

The Minnesota Constitution requires the state to maintain a system of public schools that is "general and uniform" as well as "thorough and efficient…." *Minn. Const. art. XIII, § 1.* Under *Minn. Stat. § 120A.22, subd. 5*, children between the ages of 7 and 16 are required to attending school. *Minn. Stat. § 120A.22, subd. 5.* Because Minnesota guarantees an education to students such as WD, his property interest in a public education is protected by the *Fourteenth Amendment's Due Process Clause. See Goss v. Lopez, 419 U.S. 565, 574 (1975)* (holding that because Ohio maintained a school system

that it required children to attend, the state was "constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause")*; In re Expulsion of N.Y.B., 750 N.W.2d 318, 327 (Minn. Ct. App. 2008)* ("Education is a fundamental right in Minnesota, as well as property interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution." (*citations omitted*)).

Federal Courts for the District of Minnesota have held that students have a constitutionally protected property interest in participating in varsity interscholastic sports. *See J.K. v. Minn. Pub. Schools et. al., 849 F. Supp. 2d 865, 876 (2011 U.S. Dist.); See Giblin v. Minnesota State High School League, 1982 U.S. Dist. LEXIS 13539 at \*8)*. The Minnesota Supreme Court has held that "participation in interscholastic activities [is] an important and integral facet of the youth's education process…." *Thompson v. Barnes, 200 N.W.2d 921, 926 n. 11 (Minn. 1972)*. That Court has also cited with favor *Kelly v. Metropolitan County Board of Education of Nashville and Davidson County*, which held that "the right or interest that the … students were deprived of by virtue of the one year suspension, i.e., the right to engage in secondary school athletics, is of such significance and worth as to require that the proceedings which resulted in the one year suspension conform to the standards of due process." *293 F. Supp. 485, 492 M.D. Tenn. 1968*. In addition, the Minnesota Attorney General found that for certain purposes interscholastic sports are "co-curricular" rather than "extra-curricular" activities. *Minn. Op. Att'y Gen. 169-X, 1977 Minn. AG LEXIS 8, 1977 WL 36280 (Sept. 22, 1977)*. The Eighth Circuit Court of Appeals has weighed in on the issue as well, stating that

"participating in interscholastic sports is a substantial and cognizable" interest. *Brenden v. Ind. School Dist. No. 742, 477 F.2d 1292 (8th Cir. 1973).* As such, it is irrefutable that WD has a property right protected by the *Fourteenth Amendment* which cannot be taken away without adequate process.

The League's Bylaws and their subjective interpretation and enforcement deny WD of a constitutionally protected property right. Students know through custom and usage in the sport's community that the League grants eligibility in circumstances other than a "bona fide residence change", but are forced to wait until after a transfer is finalized, under League Bylaw 300.3(C)(2) for the League to determine if their particular circumstance is a sufficient circumstance to warrant eligibility. The League's fallback that the student retains eligibility under Bylaw 300.3 (C)(6) fails for two reasons. First, it ignores the common sense reality of student life- what student wants to play for the school they just left, and for that matter what varsity coach will pick and play a student that just left their school. Practically speaking, the transfer student has a strong interest in doing what he or she can do to quickly immerse themselves in their new school. Secondly, the Bylaws themselves take away the "sending school varsity option" once the student appeals the eligibility determination. Bylaw 300.3(C)(6)(11). In this case, WD's property right was extinguished by the League the minute he showed up at LNHS. WD has been deprived of his constitutionally protected right to maintain eligibility and all that remains in analyzing Plaintiffs' likelihood of success on the merits under Count One is how the League's Bylaws themselves, as well as the implementation, interpretation, and

enforcement of those Bylaws does not afford Plaintiffs due process with relation to WD's eligibility to play varsity athletics.

   b.   *The League's Bylaws Either Plainly Provide that WD Should Have Been Deemed Eligible or in the Alternative are So Vague as to be Void*

Starting with the Bylaws themselves, as this is what the Plaintiffs relied upon before making the final determination to transfer, eligibility determinations and the rules governing them are set forth in League Bylaws 111 and 300. Bylaw 300 provides eight common sense circumstances that warrant the League granting student eligibility such as family finances, a death in the family, academics and administrative error. Bylaw 300 provides  in pertinent part that circumstances warranting the granting of eligibility, include but are not limited to:

   5)  Enrollment in an Advance Placement program, an International Baccalaureate program or similar advanced academic program not offered at the school the student attends. […]

   8)  Other conditions not covered above but which may be agreed to by both the Sending and Receiving Schools.

The League is a non-profit corporation promulgated under Minn. Stat. s. 317A, and therefore its Bylaws are those of a non-profit corporation. *Minn. Stat. § 128C.01, subd 1; Minn. Op. Att'y Gen. 1035, 1999 Minn. AG LEXIS 5 (Aug. 23, 1999).* In examining corporate bylaws, a court examines them to determine their plain meaning. *Isaacs v. American Iron & Steel Co., 690 N.W.2d 373, 375 (Minn. App. 2004); Mauer, et al., v. Kircher, 587 N.W.2d 512, 513 (Minn. App. 1998); American Commerce Ins. Brokers, Inc.*

*v. Minn. Mut. Fire & Cas. Co., 551 N.W.2d 224, 227-28 (Minn. 1996)*. The language of Bylaw 300.03(A)(5) explicitly provides that one of the exceptions to ineligibility is "Enrollment in an Advance Placement program, an International Baccalaureate program or similar advanced academic program not offered at the school the student attends." There is no mention of any additional standard or requirement, or that if the sending school has any advanced program that then the student cannot rely upon this exception. By its plain meaning, if the student is enrolled in an advanced academic program not offered at the sending school then he or she fits within the exception of Bylaw 300.03(A)(5). Also by its plain meaning, if the student was determined to not be in an advanced academic program, then his or her situation does not fall within Bylaw 300.3(A)(5). In other words, WD would either be covered by (A)(5) or not.

If not, then WD could avail himself of (A)(8) provided that the sending and receiving schools agreed. In this case, Plaintiffs were informed that the schools could not provide a preliminary opinion of WD's eligibility status because he had not transferred. That said, AHA supported his eligibility from as early as July 10, 2012 by way of letter and LNHS supported his eligibility immediately on learning of WD's academic purpose. In addition, the League does not offer advisory opinions of whether or not a particular student will be eligible. Under Bylaw 300.3(C)(2)- "Transfer eligibility determinations and transfer eligibility appeals can only be submitted to the League *once* the student has *completed* the transfer."However, it is customary and common in the  Plaintiffs' community that: (1) students transfer schools without a "bona fide residence change", such as apartment rentals for a limited duration, and were still eligible for varsity

athletics; and (2) the League stated that academic transfers were "routinely approved". Plaintiffs had no meaningful and legitimate access to previous examples of League enforcement, such as past eligibility decisions, so as to have an understanding of the League's interpretation of its Bylaws.  While the League has the ability to publish its interpretations in its yearly eligibility brochure and on its website, it has chosen not to do so.

It was under these facts that Plaintiffs had to decide whether WD would transfer to LNHS.  Considering those facts, it was reasonable for Plaintiffs to predict that because WD was transferring for academic purposes, to a receiving school which offered an advanced academic program not offered by the sending school, with the support of the sending school, and  receiving school, that WD would be eligible for varsity athletics in either one of two ways: (1) the academic purpose exception under 300.3(A)(5) or the mutual agreement exception under 300.3(A)(8). Plaintiffs had no notice that the exceptions to ineligibility as stated in Bylaw 300.3(A)(1-8), that commonly apply to other transfer students, would not apply to WD's situation.  Here, in contrast to the League's disjointed and unpublished interpretation, the Bylaws plainly provide that WD should be eligible.

In the alternative, if this Court determines that the plain meaning of the Bylaws can be read differently than as was read by Plaintiffs, and that another reading also leads to a reasonable result causing WD to be ineligible, then the Bylaws are so vague as to be void.   In *Stephenson v. Davenport Community Sch. Dist.,* when evaluating the constitutionality of a school ban against gang symbols, the 8th Circuit noted that:

> A vague regulation is constitutionally infirm in two significant respects. First, the doctrine of vagueness incorporates notions of fair notice or warning, and a regulation violates the first essential of due process of law by failing to provide adequate notice of prohibited conduct.  In short, a regulation is void-for-vagueness if it forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application.  Second, the void-for-vagueness doctrine prevents arbitrary and discriminatory enforcement.  A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis.

*110 F.3d 1303, 1308 (8th Cir. 1997).*

If this Court finds that a plain meaning of Bylaw 300.3(A) could forbid a student transferring at the expense of maintaining a students' eligibility where the student had a reasonable belief that he or she would be eligible under 300.3(A)(5) or (A)(8), then the Bylaws forbid transferring while maintaining eligibility in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application.  This is so because then two plain interpretations would exist, one allowing for eligibility and the other forbidding it and this possible result is exactly the type which renders the Bylaws so vague as to be void and unenforceable.

  c. *The League's Implementation, Interpretation, and Enforcement of its Bylaws are Arbitrary and Unreasonable in Violation of WD's Substantive Due Process Rights*

In maintaining a policy or practice of determining varsity eligibility based on an unpublished League interpretations of the Bylaws, Defendants' implementation, interpretation, and enforcement of the Bylaws did not afford WD due process.  The League's own interpretation of its Bylaws shifted three distinct times: (1) the October 2, 2012 Ineligibility Determination inventing the "exceptional circumstances criteria"

standard for transfer eligibility determinations; (2) the position of the League from October 5, 2012 through October 25, 2012 which was that the presence of AP courses at the sending school precludes Bylaw 300.3(A)(5) from being a valid exception to ineligibility; and (3) the Hearing Officer's standard as stated in the October 29, 2012 Recommendation that an "advanced academic program" must be published in order to constitute an AP program which would be grounds for granting eligibility. Plaintiffs, and for that matter the public at large, have  absolutely no notice that these three shifting standards for eligibility would be superimposed upon the League Bylaws.

> **(1)** *Plaintiffs were Never Given Notice of the Unpublished "Exceptional Circumstances Criteria" Identified in the Ineligibility Determination*

The Plaintiffs had no notice of an "exceptional circumstances criteria" standard for transfer eligibility determinations prior to October 2, 2012 when the Ineligibility Determination was made.  The Bylaws, League website and League-published eligibility brochure never use the phrase "exceptional circumstances."  Because the League does not give advisory opinions, there was no possible way to obtain notice of this standard prior to WD's decision to transfer.  Perry stated at the Hearing[1] that the League had a "long standing policy" of only allowing transfers in "exceptional circumstances".  This is exactly the type of arbitrary and discriminatory enforcement the *Fourteenth Amendment* is meant to guard against as the League's unwritten policy impermissibly delegates basic policy matters to the associate director of the League for resolution on an ad hoc and

---

[1] Multiple references occur in this brief and Plaintiffs' Complaint to the Hearing which occurred on October 25, 2012.  Though Plaintiffs have requested a transcript of this hearing, one has not been provided to the Plaintiffs and therefore it has not been incorporated into the record as of the date of this Motion.

subjective basis. *Stephenson 110 F.3d at 1308*. No further explanation was given by the League or Perry as to what "exceptional circumstances" meant, how it was applied, or what the League considered "exceptional". The public currently does not have notice of the League's "exceptional circumstances" standard.

> (2)   *Plaintiffs were Never Given Notice of the Unpublished Interpretation of the League that AHA's Offering of AP Courses Caused Exception 300.3(A)(5) to Not Apply to WD's Eligibility Appeal*

The position of the League shifted from its October 2 position and from October 19, 2012 through October 25, 2012 was that the presence of any AP course at the sending school precludes Bylaw 300.3(A)(5) from being a valid exception to ineligibility. This, again, unwritten standard is not stated in (A)(5), and goes against the plain language of (A)(5) which only requires "Enrollment in an Advance Placement program, an International Baccalaureate program or similar advanced academic program not offered at the school the student attends." Further, it would bar any student who chose an academic transfer from varsity eligibility in the over 200 schools that offer AP or equivalent courses. The League's position in this regard was in response to Plaintiffs' evidence showing that WD had an academic plan together whereby he would be enrolled over the next two years in AP Microeconomics, AP Macroeconomics, Business Communications, DECA, AP Psychology, Accounting 1 and 2, and Principals of Marketing, all of which AHA did not offer. *Affidavit of Thomas Knothe, Exhibit B, Document #0134-0135. Cf. WD's Schedule, Exhibit B, Document # 0012 with AHA course offerings Document # 0017-0064.*

It would be simple for the League to have the (A)(5) exception conclude: "....if the Sending School does not offer any Advanced Placement courses, any International Baccalaureate courses or any advanced academic courses."  Because this was not done, the League's novel second interpretation of its own Bylaws was never communicated to Plaintiffs before WD's decision to transfer and thereby deprived Plaintiffs of notice that this interpretation existed. The League's justification for its unpublished interpretation is that it did not want to partake in "curriculum comparison". By (A)(5) plain language, a comparison is necessary in that the League must determine if the academic exception was "not offered at the school the student attends." Again, the League's justification of its unsupported interpretation makes little sense in light of the plain reading of the Bylaw and could have simply been corrected by a minor redraft of the Bylaw or publication of its interpretation via its newsletters, yearly eligibility brochure or its website.  This lack of notice deprived WD of due process as it relates to his eligibility for varsity athletics.

> (3)  *Plaintiffs were Never Given Notice that the League's Hearing Officer Would Create for the First Time a Distinction Between "Plans" "Programs" and "Schedules"*

The League's interpretation of its Bylaws continued its to change throughout the appeal process. Unrebutted evidence at the Hearing established that WD was participating in an advanced academic program at LNHS which was not offered by AHA. This was agreed to by AHA, LNHS, an expert witness, and even to some extent the League's attorney.  The League offered no testimony to the contrary.  As stated above, the League's position at the Hearing was simply that because AHA offered some AP courses, albeit not the courses offered at LNHS,  the academic purpose exception

300.3(A)(5) did not apply.  The Hearing Officer found that WD's transfer was not for an

"athletic purpose" and commended WD on the rigor of WD's course load, but went on to

state that:

> In this case, the Student, his parents, his tutor and school administrators
> *created a specific course schedule* over the next two years designed to
> advance his individual educational goals.  This **_plan_** and the designed
> courses are not part of any specific Advanced Business Program at LNHS.
> Rather, they are *courses*, mostly electives, which appear in one of the many
> "Career Pathways" offerings at LNHS.   These "Pathways" are not
> Advanced Placement Programs.   The Advanced Business Program at
> LNHS does not appear in any course catalogue at LNHS, nor is it
> advertised to potential students.  Rather, it appears to be a **_plan_** specifically
> designed to meet the desired goals of one individual student.  Self-designed
> **_courses, schedules, and plans_** are commendable.  However, that does not
> rise to the level of an Advanced Placement Program as contemplated by
> Bylaw 300.3.A.5.

Exhibit D, Document # 155 (*emphasis added*). In other words, the Hearing Officer did

not state that WD's academic course load was not "advanced" nor did he state that WD's

academic plan at LNHS was "offered" at AHA.  Instead, the Hearing Officer determined

that WD's plan did not constitute a "program" and therefore 300.3(A)(5) did not apply.

This determination is completely at odds with the plain meaning of the words "plan" and

"program".   "Plan" is defined by The American Heritage Dictionary of the English

Language, as:

1. A scheme, **_program_**, or method worked out beforehand for the
   accomplishment of an objective: a plan of attack.
2. A proposed or tentative project or course of action: had no plans for the
   evening.
3. A systematic arrangement of elements or important parts; a configuration or
   outline: a seating plan; the plan of a story.

4. A drawing or diagram made to scale showing the structure or arrangement of something.

5. In perspective rendering, one of several imaginary planes perpendicular to the line of vision between the viewer and the object being depicted.

6. A ***program*** or policy stipulating a service or benefit: a pension plan.

*Fourth Edition copyright 2000, published by Houghton Mifflin Company (updated in 2009) (emphasis added).*  A "program" is defined as:

1.
   a. A listing of the order of events and other pertinent information for a public presentation.
   b. The presentation itself: a program of piano pieces.

2. A scheduled radio or television show.

3. *An ordered list of events to take place or procedures to be followed*; ***a schedule***: a program of physical therapy for a convalescent.

4. A system of services, opportunities, or projects, usually designed to meet a social need: "Working parents rely on the center's after-school latchkey program" (New York Times).

5.
   a. *A course of academic study; a curriculum.*
   b. ***A plan or system of academic and related or ancillary activities***: a work-study program.
   c. ***A plan or system of nonacademic extracurricular activities***: the football program.

6. A set of coded instructions that enables a machine, especially a computer, to perform a desired sequence of operations.

7. An instruction sequence in programmed instruction.

*Id. (emphasis added).*  The overlap in the definition of the two words clearly shows that a person of ordinary intelligence would treat the words synonymously in the context of WD's appeal.  That the Hearing Officer would parse such a fine distinction between words in order to arrive at the League's desired result, ineligibility, is without any justification. In any event there was absolutely no notice provided to Plaintiffs prior to

WD's decision to transfer to LNHS that the Bylaws would be interpreted in this third, arbitrary and nonsensical manner by the League.  This lack of notice concerning the interpretation of 300.3(A)(5) substantively deprived WD of due process when Plaintiffs made the decision to transfer to LNHS.

Further, the League's unpublished interpretation of the applicability of Bylaw 300.3(A)(8) flies in the face if it's plain meaning.  When it came to evaluating 300.3(A)(8), the two schools agreed at the Hearing that WD should be eligible, however the Hearing Officer determined that WD's appeal was "covered" by (A)(5) and therefore (A)(8) did not apply, thus rendering WD still ineligible.  A reasonable plain reading of (A)(5) supports the position that WD's transfer and academic plan either qualifies as a program or it does not.  If it does not, then it is not a situation "covered" by (A)(5).  Absolutely no notice existed that the Hearing Officer would engage in this type of legal contortionism with relation to the Bylaws, indeed it was not even anticipated by the League's associate director or attorney, who took  a different position at the Hearing.

In sum, Plaintiffs had no notice that the Bylaws would be interpreted contrary to a plain interpretation of Bylaw 300.3(A) through an unpublished and constantly shifting standard which placed policy making in the hands of individuals at the League who each came up with their own unique standard concerning WD's eligibility.  In this respect the League's interpretation and enforcement of its Bylaws was arbitrary, unreasonable, discriminatory and unfairly surprised Plaintiffs.   For the aforementioned reasons, Plaintiffs are likely to prevail under Counts One and Five of their Complaint and therefore this factor weighs in favor of granting a preliminary injunction.

2. *Plaintiffs are Likely to Prevail on Count Two Alleging a Breach of Contract on Behalf of the League or Count Three Alleging a Breach of a Fiduciary Duty on Behalf of the League*

A corporation's articles of incorporation embody a contract between the state and the corporation, as well as among the shareholders. *Humphrey v. Delano Community Dev. Corp. 571 N.W.2d 233, 233 (Minn. 1997); Midland Coop. Wholesale v. Range Coop. Oil Ass'n, 274 N.W. 625, 625 (1937).* In this case, WD was party to the League's Bylaws by virtue of the yearly Eligibility Statement all co-curricular participants are required to sign. Read with this background, WD was agreeing to refrain from things such as doing drugs, drinking alcohol, or bullying other students in exchange for eligibility in co-curricular activities. Therefore, there is a contract between the League and WD concerning his eligibility.

As stated earlier, the League is a non-profit corporation promulgated under Minn. Stat. § 317A, and therefore its Bylaws are those of a non-profit corporation. In examining corporate bylaws, a court examines them to determine their plain meaning. *Isaacs 690 N.W.2d at 375.* WD signed an agreement promising to abide by the Bylaws in exchange for his eligibility. Because principles of contract interpretation apply in interpreting the League Bylaws, any ambiguity with regard to Bylaw 300.03(A)(5) or (A)(8) should be construed against the drafter and in favor of WD. *American Commerce Ins. Brokers, 551 N.W.2d at 227; Hydra-Mac Inc. v. Onan Corp., 450 N.W.2d 913, 917 (Minn. 1990).* WD has not violated any Bylaw, to the contrary he has followed every single requirement that has been asked of him, and Plaintiffs have properly categorized

WD's situation as one which falls under the plain reading of Bylaw 300.3(A) which should therefore grant him eligibility.

If this Court determines that WD does not have a contractual relationship with the League, then he at a minimum is a third-party beneficiary of the clear contract between the member schools, the League, and the state. The Bylaws contain mission statements of what the League stands for, in part: "providing educational opportunities" for students through interscholastic athletics and fine arts programs; allowing for "equal opportunity to participate in all activities offered" by the students' school; working "collaboratively" with parents to enhance a school's opportunity to positively impact student success; and ensuring that school-sponsored "activities must be inclusive, not exclusive." The mission statement section of the Bylaws, when read with the rules governing eligibility of transfers, create a duty to third-party beneficiaries to abide by the Bylaws in such a manner so as to construe the transfer eligibility rules in light of the mission statements: to provide the most students as possible with co-curricular opportunities . When this is done, it is clear that the League has acted in a manner inconsistent with its Bylaws to the detriment of WD. For the aforementioned reasons, WD is likely to prevail on either Count Two alleging a breach of contract or on Count Three alleging a breach of fiduciary duty. Prevailing on either of these counts would cause it to be appropriate that a permanent injunction granting WD eligibility issue and therefore this factor weighs in favor of granting a preliminary injunction.

**B.      THE BALANCE BETWEEN THIS HARM AND THE INJURY THAT GRANTING THE INJUNCTION WILL INFLICT ON THE OTHER LITIGANTS FAVORS GRANTING THE PRELIMINARY INJUNCTION**

The harm to be suffered by WD if the restraint is denied outweighs that inflicted on the Defendants if the injunction is issued.  WD would be deprived of varsity eligibility at LNHS while the season was underway.   WD is a junior and desires to play hockey.  The Minnesota High School Hockey season is short and covers only 25 games over basically three months.  The harm inflicted on WD were the in injunction not granted is great as he would lose the very thing this suit seeks to preserve, his eligibility.   The League, on the other hand, is not affected in any manner whatsoever by WD being granted eligibility.  There is no way in which the League would be harmed by allowing a student who undisputedly transferred under these facts to be varsity eligible.   As the League Hearing Officer stated, WD is not to be punished, he is to be "commended".  Considerations of this factor weigh unquestionably and strongly in favor of a preliminary injunction being issued.

**C.      THE THREAT OF IRREPARABLE HARM TO PLAINTIFFS IS CERTAIN**

The hockey season began at LNHS on November 12, 2012 and ends roughly three months later.  Every day that WD misses is a day that cannot be recovered; it is irreparably lost.   In other words, if a preliminary injunction does not issue Plaintiffs would lose the case before it even got to a dispositive motion or trial on the merits.

**D.**     **THE PUBLIC INTEREST FAVORS GRANTING A PRELIMINARY INJUNCTION**

Public policy is in favor of allowing cases to go forward on their merits without being deprived of a significant right by the length of time the judicial process requires. A preliminary injunction preventing Defendants from barring Plaintiff from fully participating in his education furthers these interests. Defendants may try to argue that deference needs be given the League as it is acting as an agency. Minn. Stat. § 128C.02 subd. 4 specifically exempts the League from the APA and therefore it is not treated the same as an agency, therefore no deference should be given in any circumstance. The MN Attorney General further issued an advisory opinion to the MN State Auditor that the League is for all practical purposes a private non-profit corporation. *Minn. Op. Att'y Gen. 1035, 1999 Minn. AG LEXIS 5 (Aug. 23, 1999).*

Even if this Court disagreed with the above analysis, and found that deference could in certain circumstances be given to the League, in this case no deference should be afforded to the League. Even agencies should provide regulated parties fair warning of the conduct a regulation prohibits or requires. *Christopher v. Smithkline Beecham Corp.,* 80 U.S.L.W. 4463 *(U.S. 2012).* Adequacy of notice to regulated parties has been identified as one factor relevant to the reasonableness of the agency's interpretation and the application of a regulation in a particular situation may be challenged on the ground that it does not give fair warning that the allegedly violative conduct was prohibited. *Id.* Importantly, courts will not accord substantial deference to an agency's interpretation of an ambiguous rule in circumstances where the rule did not place the individual or firm on notice that the conduct at issue constituted a violation of a rule. *Id.* Thus, in the instant

case, even if *arguendo* the League were entitled to some deference in other cases, the unfair surprise present in this case serves to deprive the League of any deference it might otherwise be afforded.

Finally, the League may attempt to argue that granting a preliminary injunction prevents the League from operating and enforcing its rules. First, as it is enforcing vague Bylaws without due process it is unclear how the public interest should promote the continuation of this practice. Second, in *Giblin*, the League itself stipulated to a preliminary injunction granting eligibility, and thus its past willingness to allow a preliminary injunction to issue undercuts its position in this respect. Third, public policy and the League's own mission support WD's eligibility. He is not attempting to return after a suspension for substance abuse or bullying, he did not make a transfer for an athletic purpose, instead, as agreed to by the sending and receiving schools and the League, he simply transferred for an advanced academic purpose. To deny WD eligibility because his undisputed academic transfer fails to meet the League's unpublished interpretation would result in WD being punished more severely by the League under its Bylaws than a three time offender of the League substance abuse policy. *See League Bylaw 205.2(A-D)*. For all of the above reasons, the public interest supports a preliminary injunction being issued.

## CONCLUSION

WD's constitutionally protected right to be eligible to participate in varsity athletics has been deprived. That deprivation occurred without notice, without due process, and in violation of Minnesota Statute. The League has failed to uphold its end of

the contract as set forth in the Bylaws, has refused to abide by its fiduciary duties, is violating Minnesota law, and is violating the Constitution of the United States in its drafting, implementation, enforcement, and interpretation of its Bylaws to the detriment of Plaintiffs.  Therefore Plaintiffs respectfully request that a preliminary injunction issue.

Respectfully Submitted,

Dated:  November 14, 2012                    WAGNER, FALCONER & JUDD, LTD.


                                             _/e/ Matthew D. Resch_____
                                             Matthew D. Resch (ID # 388856)
                                             1700 IDS Center
                                             80 South Eighth Street
                                             Minneapolis, MN 55402-2113
                                             (612) 339-1421
                                             **ATTORNEYS FOR PLAINTIFFS**