UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| W.D., *a minor child, by and through his parents* M.J.D. and M.C.D., *and on their own behalf*, | Civil No. 12-2892 (JRT/SER) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION AND WAIVER OF SECURITY** |
| v. | |
| MINNESOTA STATE HIGH SCHOOL LEAGUE and CRAIG PERRY *individually and in his official capacity*, | |
| Defendants. | |

Matthew D. Resch, **WAGNER, FALCONER & JUDD, LTD**, 80 South Eighth Street, Suite 1700, Minneapolis, MN 55402, for plaintiffs.

Joseph A. Kelly and Patrick J. Kelly, **KELLY & LEMMONS, PA**, 7300 Hudson Boulevard, Suite 200, St. Paul, MN 55128, for defendants.

Plaintiffs, W.D. and his parents, M.J.D. and M.C.D., seek a temporary restraining order or preliminary injunction to enjoin Defendants, the Minnesota State High School League and its Associate Director, Craig Perry, (collectively, "the League"), from enforcing their determination that W.D. is ineligible to compete in varsity hockey during his junior year. W.D. transferred to a new high school prior to his junior year, for academic reasons, and believed, based on the League's Bylaws, that he would be immediately eligible. But the League interpreted its Bylaws differently and, after an appeal and a hearing, determined that W.D. would be ineligible to participate in varsity athletics for one year. Plaintiffs' underlying complaint alleges procedural and substantive

due process violations under 42 U.S.C. § 1983, breach of contract, breach of fiduciary duty, violation of Minnesota's Open Meeting Law, and violation of Minn. Stat. § 128C.03, which requires the League to provide public notice of its eligibility rules. Because the Court finds that Plaintiffs have demonstrated a probability of success on the merits of their procedural due process claim, that W.D. will suffer some degree of irreparable harm in the absence of injunctive relief, and that the balance of harms and public interest weigh in favor of injunctive relief, the Court will grant Plaintiffs' motion and enjoin the League from enforcing its determination that W.D. is ineligible pending resolution of the merits of the action.

## BACKGROUND

### I.  W.D.'S TRANSFER

W.D. is an eleventh grader at Lakeville North High School ("LNHS"). (Compl. ¶ 8, Nov. 15, 2012, Docket No. 1.) He and his parents reside within the boundary of the Lakeville school district. (*Id.* ¶ 5.) W.D. transferred to LNHS from the Academy of Holy Angels ("AHA") prior to the Fall 2012 term. (*Id.*) The reason for the transfer was that LNHS offered AP courses in economics and business, marketing courses, DECA ("an interscholastic offering that prepares emerging leaders and entrepreneurs for careers in marketing, finance, hospitality and management"), and a "Business Career Pathways Program," all of which were not offered at AHA. (*Id.* ¶ 13.) In the summer of 2012, WD and his parents met with the dean of LNHS and arranged for W.D. to complete the program in his remaining two years of high school. (*Id.* ¶14.)

W.D.'s two-year academic plan includes five AP classes, seven honors classes, and four other classes. (*Id.* ¶ 17.) Six of the AP/honors courses are related to the "Business Career Pathways Program" (Advanced Marketing, AP Microeconomics, AP Macroeconomics, AP Psychology, Business Communications, and AP Statistics). (*Id.*) Three of the non-AP/honors courses are related to business as well (Accounting 1 and 2, Principles of Marketing/DECA). (*Id.*) AHA offers some AP classes, including AP Statistics, but does not offer the other eight business-related courses W.D. plans to take at LNHS. (*Id.*, Ex. B at 12.)

## II. TRANSFER ELIGIBILITY RULES

Ordinarily, a transfer student is ineligible for varsity athletics for one year from the date of transfer. League Bylaw 111.3.[1] There are, however, a set of standard exceptions that allow a transfer student to be immediately eligible for athletics, but none of the standard exceptions apply to W.D. *See* League Bylaw 111 (allowing immediate eligibility if the student was in good standing at his or her prior school and one of the following applies: (1) 9th grade option, (2) family residence change, (3) court ordered residence change for child protection, (4) custody of student (divorce), (5) move from out of state, (6) enrollment options program).

However, Bylaw 300.3.A provides eight additional exceptions that allow for immediate eligibility. For the Court's purposes, two of these additional exceptions are relevant. Bylaw 300.3(A)(5) ("Exception Five") allows immediate eligibility if the

---

[1] The League Bylaws are available as exhibits 4-9 of Defendants' brief. (*See* Defs.' Memo. in Opp., Exs. 4-9, Nov. 23, 2012, Docket No. 6.)

student transfers for "[e]nrollment in an Advanced Placement program, an International Baccalaureate program or similar advanced academic program not offered at the school the student attends." And Bylaw 300.3(A)(8) ("Exception Eight") allows immediate eligibility for "[o]ther conditions not covered above but which may be agreed to by both the sending and receiving schools."

According to the parties, the school to which a student transfers makes an initial eligibility determination solely on the basis of the standard exceptions in Bylaw 111. The school may not consider the additional exceptions in Bylaw 300. If a student believes one of the additional exceptions in Bylaw 300 apply, the student may utilize the League's Appeal Process and Fair Hearing Procedure. *See* Bylaw 300.3. The processes are somewhat complex, but essentially a student may submit documents to the League in an attempt to establish the applicability of one of the eight exceptions, and then, if the student does not prevail on this appeal, the student may attempt to establish the applicability of one of the eight exceptions at a "Fair Hearing" before an independent hearing officer. *See* Bylaw 300.3.

## III.   THE TRANSFER ELIGIBILITY REVIEW PROCESS

W.D. and his parents contacted the League prior to W.D.'s transfer to determine whether any of the exceptions in Bylaw 300 would allow W.D. to be immediately eligible. The League refused to provide a determination of W.D.'s eligibility prior to his transfer, but allegedly informed W.D.'s parents "that in general students transferring for academic reasons are routinely approved." (Compl. ¶ 16.) When W.D. arrived at LNHS,

the school determined that he was ineligible because of Bylaw 111, and he was told that he could appeal the ineligibility determination. (*Id.* ¶ 18.)

Plaintiffs appealed the initial ineligibility determination on September 17, 2012, with the support of LNHS's activities director, Robert Ertl, and AHA's activities director, Michael Kautzman. (*Id.* ¶ 19.) The first appeal consisted of completing an online form describing the nature of the appeal. (*Id.*, Ex. A.) On October 2, 2012, the League denied Plaintiffs' appeal, asserting that "[t]he rationale submitted by the family in the appeal does not meet the exceptional circumstances criteria identified in the [Bylaws]."[2] (*Id.*)

On October 5, 2012, Plaintiffs requested a "Fair Hearing Appeal." (*Id.* ¶ 23.) A league-appointed independent hearing officer presides over Fair Hearing Appeals and issues a written recommendation to the League's Board of Directors. (*Id.*) Prior to the hearing, Plaintiffs requested documents related to the earlier denial of eligibility and also requested documents relating to prior, similar hearings pursuant to the Data Practices Act. (*Id.* ¶ 24.) Defendants have not provided the requested documents. (*Id.*)

During the hearing, both activities directors stated that they supported W.D.'s appeal. (*Id.* ¶ 25.) LNHS's representative testified that W.D.'s two-year plan constituted an advanced academic program and that LNHS does not advertise an advanced business program, which is consistent with standard practice among Minnesota public schools. (*Id.*) AHA's representative testified that no similar program existed at AHA. (*Id.*) Plaintiffs also hired the dean of a business school to provide an expert opinion, and the

---

[2] As Plaintiffs note, the phrase "exceptional circumstances" does not appear in Bylaw 300, thus raising the possibility that an incorrect standard was used to determine the appeal.

dean opined that LNHS offered an advanced business program that was not offered at AHA. (*Id.*)

League Associate Director (and Defendant) Perry argued that if any AP courses were offered at AHA, then Exception Five does not apply. (*Id.* ¶ 26.) He also argued that the intent of Exception Five was not to enter into curriculum comparisons. (*Id.*) Perry stated that he met with the League's executive committee concerning W.D.'s appeal before he had denied it on October 2. (*Id.* ¶ 27.)

The hearing officer submitted his recommendation on October 29, 2012. (*Id.* ¶ 28.) He concluded that W.D.'s transfer was not for athletic reasons, but accepted Perry's arguments that Exception Five was not intended to lead to curriculum comparisons, that students were not eligible if the prior school offered **any** AP classes, and that W.D's two-year plan did not constitute a "Program." (*Id.*) The hearing officer concluded that Exception Eight did not apply because W.D.'s circumstances were covered by Exception Five, but Exception Five was not satisfied. (*Id.*)

## IV.   W.D.'S CURRENT STATUS

In the absence of injunctive relief, W.D. will be ineligible to compete in varsity athletic competitions for one year from the date of his transfer. *See* Bylaw 111.2(F). He is also barred by the Bylaws from playing on the varsity team at his former school. *See* Bylaw 300.3(C)(11). W.D. will be eligible for junior varsity hockey, *see* Bylaw 111.2(F)(1), and according to the League, he will not be prohibited from practicing and scrimmaging with the varsity team, although his father avers that the LNHS coaching

staff will not allow him to practice with the varsity team if he is ineligible, (First Aff. of M.J.D. ¶ 7, Nov. 26, 2012, Docket No. 7.)

LNHS's hockey season began on November 12, 2012. (Compl. ¶ 29.)

## ANALYSIS

### I. STANDARD OF REVIEW

The Court considers four factors in determining whether to grant preliminary injunctive relief: (1) the probability that the moving party will succeed on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance of harms as between the parties; and (4) the public interest. *Roudachevski v. All–American Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011) (citing *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). Calculating the probability of success on the merits with "mathematical precision" is not required. *Dataphase*, 640 F.2d at 113. "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.*

### II. PROBABILITY OF SUCCESS ON THE MERITS[3]

Defendants do not dispute that the League acts under color of state law when it makes eligibility determinations. *See Brenden v. Indep. Sch. Dist. 742*, 477 F.2d 1292, 1295 (8th Cir. 1973) ("[D]efendant Minnesota State High School League and the

---

[3] The Court will only address Plaintiffs' procedural due process claim because it appears, at this preliminary stage, to be Plaintiffs' strongest claim.

defendant school districts are acting under color of state law." (internal quotation marks omitted)). Therefore, if W.D. establishes that the League deprived him of a right secured by the United States Constitution, the League will be liable pursuant to 42 U.S.C. § 1983.

### A. Constitutionally Protected Property Interest

The Fourteenth Amendment forbids deprivations of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Courts look to state law to determine whether a person possesses a property interest worthy of constitutional protections. *See Goss v. Lopez*, 419 U.S. 565, 572-73 (1975). The Fourteenth Amendment's due process requirements are applicable only if a person has a "legitimate claim of entitlement" under state law to the property interest that is threatened. *See id.* at 573. Therefore, the Court must analyze whether W.D. might be able to establish that he has a legitimate claim of entitlement to eligibility for interscholastic athletics.

In a recent opinion, this District thoroughly analyzed the issue at hand and concluded that there is "a strong argument that, under Minnesota law, [the] property interest in an education extends to participation in interscholastic sports." *J.K. ex rel. Kaplan v. Minneapolis Pub. Sch. (Special Sch. Dist. No. 1)*, 849 F. Supp. 2d 865, 877 (D. Minn. 2011); *see also Giblin v. Minn. State High Sch. League*, Civ. No. 4-81-767, 1982 WL 963044, at *3 (D. Minn. Jan. 15, 1982) (noting that "various authorities reveal[] that eligibility to participate in interscholastic sports is part and parcel of the right to education" and holding, for purposes of preliminary injunctive relief, that plaintiffs had "an expectation of continued eligibility for interscholastic sports sufficient to require that procedural due process be afforded before suspension"). At this preliminary stage, the

Court concludes, similar to the *J.K.* case, that W.D. has a probability of establishing that he has a legitimate claim of entitlement to athletic eligibility under Minnesota law, which in turn means that any limitation on his eligibility would have to conform to the requirements of due process.[4]

The Court's conclusion is supported by various sources of Minnesota law. First, in *Thompson v. Barnes*, 200 N.W.2d 921, 926 n.11 (Minn. 1972), the Minnesota Supreme Court noted that interscholastic activities are "recognized . . . as an important and integral facet of the youth's education process." Because Minnesota law creates a property right to education in public schools,[5] *Thompson*'s assertion that interscholastic activities are an integral aspect of education suggests that the Minnesota Supreme Court might recognize a similar right to interscholastic athletic eligibility. The *Thompson* case did not explicitly recognize such a constitutional right but, somewhat tellingly, it relied favorably on a case

---

[4] The Court recognizes that the majority of courts to directly confront this issue have held, under various states' laws, that there is not a constitutionally protected property interest in athletic eligibility. For a collection of cases, see *J.K.*, 849 F. Supp. 2d at 875 n.7. The Court also recognizes that this District held in *Peterson v. Indep. Sch. Dist. No. 811*, 999 F. Supp. 665, 674 (D. Minn. 1998), that "no property or liberty interest exists in a student's participation in extracurricular activities." This Court respectfully finds at this stage that it is likely that it would reach a different conclusion. Finally, the Court recognizes that the Minnesota Court of Appeals cited *Peterson*'s holding in *Eason v. Indep. Sch. Dist. No. 11*, 598 N.W.2d 414, 419 (Minn. Ct. App. 1999). However, *Eason* expressly stated that it "need not consider whether [plaintiff] would likely succeed on the merits of a section 1983 claim alleging denial of due process because [plaintiff] did not make such a claim." *Id.* at 418.

[5] *See* Minn. Const. art. XIII, § 1 (requiring the legislature "to establish a general and uniform system of public schools"); Minn. Stat. § 120A.22, subd. 5 (requiring children between the ages of seven and sixteen to attend school); *Goss*, 419 U.S. at 574 (holding that because Ohio maintained a public school system and required its children to attend, it must "recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause"); *see also J.K.*, 849 F. Supp. 2d at 871 (holding that Minnesota law creates a constitutionally protected property interest in education); *Giblin*, 1982 WL 963044, at *3 (same).

from the Middle District of Tennessee that recognized such a right. *See id.* (citing *Kelley v. Metro. Cnty. Bd. of Educ. of Nashville & Davidson Cnty.*, 293 F. Supp. 485 (M.D. Tenn. 1968).

Second, Minn. Stat. § 128C.03 requires the League to "adopt procedures to ensure public notice of all eligibility rules and policies that will afford the opportunity for public hearings on proposed eligibility rules." By requiring public notice of eligibility rules and by constraining the League's ability to change eligibility rules without public hearings, Minn. Stat. § 128C.03 supports a claim of entitlement to interscholastic athletic eligibility, such that limitations on eligibility must conform to the requirements of due process.

Third, the Minnesota Attorney General has issued two opinions suggesting that due process protections might attach to interscholastic athletic eligibility. First, in 1977, the Attorney General opined that in some situations interscholastic sports should be considered co-curricular as opposed to extra-curricular. *See* Minn. Op. Att'y Gen. 169-X, 1977 WL 36280 (Sept. 22, 1977). This opinion suggests that the interest in athletic eligibility may be on equal footing with the interest in public education generally. Second, in 1989, the Attorney General stated that when disciplinary decisions impact athletic activities, "[d]ue process, with regard to such discipline, must be considered." *See* Minn. Op. Att'y Gen. 169-F, 1989 WL 505812, at *3 (Mar. 28, 1989). The Attorney General noted that the Minnesota Supreme Court had not decided the issue, but pointed to *Thompson* as an indication of the Court's potential stance on the issue. *See id.*

On the basis of the authority above, the Court concludes, like the courts in *Giblin* and *J.K.*, that W.D. has a probability of successfully establishing that he has a constitutionally protected property interest in interscholastic athletic eligibility.

### B.     Due Process

The Court must next determine whether W.D. has a probability of successfully establishing that the League's limitation of his eligibility did not conform to the requirements of due process. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) ("[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." (internal quotation marks omitted)). "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Id.* at 542 (internal quotation marks omitted). Here, W.D. does not contend that his opportunity to be heard was inadequate. W.D. claims that he received inadequate notice that his transfer would render him ineligible.

"One of the fundamental requirements of due process is 'warning . . . in language that the common world will understand of what the law intends to do if a certain line is passed.'" *Giblin*, 1982 WL 963044, at *3 (quoting *McBoyle v. United States*, 238 U.S. 25, 27 (1931) (Holmes, J.)). The *Giblin* court granted preliminary injunctive relief because the eligibility rule at issue "did not provide clear notice to plaintiffs that it [w]ould be interpreted to apply" in their circumstance. *Id.* The Court finds that *Giblin*'s reasoning applies with equal force at this preliminary stage in the present case.

As set forth above, Exception Five allows immediate eligibility if a student transfers for "[e]nrollment in an Advanced Placement program, an International Baccalaureate program or similar advanced academic program not offered at the school the student attends." Bylaw 300.3(A)(5). Although AHA offers AP classes, it did not offer many of the AP and honors classes W.D. wanted to take in order to specialize in business and become a stronger college applicant. It is reasonable to read Exception Five to apply when a student transfers schools in order to take AP classes that are not offered at the former school, which is how W.D. and his parents interpreted the rule. It may also be reasonable to read the Exception differently, as the League did, but the existence of different reasonable readings suggests that Plaintiffs did not have fair notice that W.D. would be ineligible before he decided to transfer.[6] Thus, Plaintiffs have demonstrated a probability of success on the merits of their procedural due process claim.[7]

---

[6] Exception Eight, which allows immediate eligibility for "[o]ther conditions not covered above but which may be agreed to by both the sending and receiving schools," Bylaw 300.3(A)(8), is similarly subject to multiple reasonable interpretations. The League's interpretation is that W.D.'s situation was "covered" by Exception Five because Exception Five addresses students that transfer for academic reasons, but that W.D.'s situation did not qualify for that exception. On the other hand, Plaintiffs contend that if Exception Five does not apply to W.D.'s situation, as the League determined, then W.D.'s situation is not "covered" by Exception Five and Exception Eight could apply. This is a reasonable interpretation of the interplay between Exceptions Five and Eight.

[7] The League claims that recognizing a constitutionally protected property interest in interscholastic athletic eligibility would result in a flood of trivial litigation over roster decisions or even playing time. One clear problem with the League's argument is that the right in question in the present case is the right to be **eligible** for interscholastic athletics, **not** the right to make a particular team or receive a certain amount of playing time. The Court's conclusion that students in Minnesota may have a legitimate claim of entitlement to eligibility for interscholastic athletics does **not** lead to the conclusion that they may also have a legitimate claim of entitlement to play at a particular level or receive a certain amount of playing time.

## III. IRREPARABLE HARM

In the absence of injunctive relief, W.D. will be ineligible for varsity athletics during his junior year of high school. Whether harm qualifies as irreparable hinges not on the magnitude of the harm, but on whether the harm is quantifiable and compensable with money damages. *See, e.g.*, *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 318-20 (8th Cir. 2009). While not as grave as many matters that pass before this Court, the harm of losing a year of varsity eligibility is difficult to quantify and would constitute irreparable harm. *See Giblin* 1982 WL 963044, at *2 ("The threat of irreparable harm to plaintiffs consists of [plaintiffs'] inability to play varsity sports if the League's ruling is allowed to stand. . . . If plaintiffs were ultimately found to be entitled to permanent injunctive relief after a trial on the merits, that relief would be meaningless if the athletic seasons were over.").[8]

## IV. BALANCE OF HARMS

The League suggests several ways in which it would be harmed by the Court granting preliminary injunctive relief. First, the League contends that it would undermine its control over interpretation of its Bylaws and create administrative burdens because it would have to conduct evidentiary hearings any time a student sought to transfer to a school with a different slate of advanced course offerings. This argument misses the

---

[8] The Minnesota Court of Appeals held in *Eason* that a plaintiff failed to establish that lack of participation in school athletics constituted irreparable harm. *See* 598 N.W.2d at 419. However, *Eason* did not directly address whether a student's interest in interscholastic athletic eligibility was entitled to due process protection. *See id.* at 418. In light of this Court's holding that athletic eligibility may warrant due process protections, it follows that being wrongfully deprived of eligibility may amount to irreparable harm.

mark because this order does not require the League to change its interpretation of its Bylaws.  Even if Plaintiffs eventually succeeded on the merits of their notice-based procedural due process claims, the League could still interpret Exception Five as it currently interprets it.  The League would simply have to provide more effective notice of that interpretation to ensure that students understood its interpretation before transferring.  Of course, Exception Five could be rewritten to conform clearly to the League's interpretation.

Second, the League suggests that if the Court granted preliminary injunctive relief and the League later prevailed on the merits, all games in which W.D. participated would be mandatorily forfeited because an ineligible player participated and opposing schools would file protests.  Relatedly, the League suggests that LNHS would be subject to sanctions for allowing an ineligible player to compete.  These purported harms, made in the nature of a threat, are of little concern because any attempt to challenge W.D.'s participation or sanction LNHS for allowing W.D. to participate when this Court had explicitly authorized W.D.'s participation would be baseless.

Third, the League notes that granting preliminary injunctive relief would displace another player on LNHS's roster to make room for W.D.  However, the disappointment that another student might experience is of a different nature than the harm W.D. would suffer if he were wrongfully deprived of his eligibility.  As the Court explained above, the right in question is the right to be **eligible** for athletics, not any purported right to make a given team or receive a certain amount of playing time.

Finally, the League contends vaguely that allowing W.D. to compete would adversely affect competitive equity on the hockey rink, which is exactly the concern that motivates the League's restrictions on transfer students' eligibility. However, because there is no indication in the record that W.D. transferred for athletic purposes, the League's concerns about competitive equity are likely misplaced. For the reasons explained above, the Court finds that the League will suffer little, if any, harm by virtue of W.D. being eligible for varsity athletics pending resolution of the merits. Therefore, the balance of harm favors W.D.

## V.     PUBLIC INTEREST

Plaintiffs assert that the public interest favors preventing a deprivation of W.D.'s rights pending the resolution of the merits. Plaintiffs acknowledge that the public interest favors denying eligibility in certain circumstances, but because no one contends that W.D. transferred for athletic purposes and W.D. has not violated any of the League's policies, they contend there is no sound public policy basis for limiting his eligibility pending resolution of the merits. The League responds that its rules serve the public interest both by prohibiting students from gaining an unfair competitive advantage and by prioritizing academics over the privileges of sports. However, granting preliminary injunctive relief would not threaten these valid public interests because W.D.'s transfer, which was not for athletic purposes, does not implicate concerns of unfair competitive advantage or prioritizing athletics above academics. The League also asserts that public interest favors avoiding judicial scrutiny of eligibility decisions because it is an area best reserved to the League. The Court agrees that its involvement in this arena is best kept to

a minimum, but the public interest strongly favors the Court preventing wrongful deprivations of rights that may be protected by the Constitution. As the analysis above explains, granting preliminary injunctive relief in the present case ensures that W.D.'s potential constitutional rights are protected.

## VI.   CONCLUSION

The Court concludes that Plaintiffs have demonstrated a probability of success on their 42 U.S.C. § 1983 procedural due process claim and the Court finds that W.D. will suffer irreparable harm in the absence of injunctive relief. Further, granting preliminary injunctive relief appears to pose little, if any, threat of harm to the League or the public interest. Therefore, the Court will grant Plaintiffs' motion for a preliminary injunction and waiver of security and enjoin the League, pending resolution of the merits of this case, from enforcing its determination that W.D. is ineligible for varsity athletics.

On a motion for a preliminary injunction, the Court is only required to make a preliminary assessment of the plaintiffs' chances for success. This review is based on the limited record available at the early stages of a case. A final determination of whether W.D. has a constitutionally protected property interest in eligibility for athletics will be before the Court at a later time on a more complete record. Although this critical question presents a close issue in this case, the question of whether W.D. was afforded due process by the League does not. While the League's interpretation of Exceptions Five and Eight may be a reasonable one, W.D.'s interpretation is at least as reasonable, and perhaps more so. Regardless, the League should make its interpretation clear so that

students making important decisions will understand and have notice of the consequences. Due process requires no less.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiffs' motion for a preliminary injunction and waiver of security [Docket No. 2] is **GRANTED** as follows:

1. Defendants are enjoined, pending resolution of the merits, from enforcing their determination that W.D. is ineligible for varsity athletics.

2. Plaintiffs are not required to provide security in seeking injunctive relief pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

DATED: November 29, 2012　　　　　　　　　s/ John R. Tunheim
at Minneapolis, Minnesota.　　　　　　　　　　JOHN R. TUNHEIM
　　　　　　　　　　　　　　　　　　　　　　United States District Judge